***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission hereby REVERSES the Opinion and Award of the Deputy Commissioner.
 *********** RULING ON EVIDENTIARY MATTERS
Plaintiff made a motion to admit additional evidence into the record, pursuant to Rule 701(6) of the North Carolina Workers' Compensation Rules. Plaintiff moved to correct *Page 2 
transcription errors existing in Dr. Flowers' deposition transcript of November 28, 2006, and to admit a September 26, 2007 letter from plaintiff's counsel to Dr. Flowers wherein Dr. Flowers clarified his testimony from that deposition. Defendant has no objection to the correction of the transcription error, and the Full Commission hereby receives the corrected transcript page 26 into evidence.
However, defendant does object to plaintiff's counsel's letter to Dr. Flowers being made part of the evidence. The Commission finds that plaintiff was afforded an opportunity to elicit testimony from Dr. Flowers at the November 28, 2006 deposition and that he shall not attempt to clarify that testimony with a letter after the fact. Thus, pursuant to Rule 701(6), the Commission DENIES plaintiff's request to admit the September 26, 2007 letter to Dr. Flowers into evidence.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Defendant employs greater than three full-time employees and is therefore subject to the North Carolina Wokers' Compensation Act. The Industrial Commission has jurisdiction over the parties and the subject matter.
2. An employment relationship existed between plaintiff and defendant at the time of plaintiff's original injury.
3. Defendant is a qualified self-insured.
4. Plaintiff was injured by accident on October 16, 2003 and defendant accepted the original knee claim as compensable. *Page 3 
5. Plaintiff's average weekly wage, as determined following his original injury date of October 16, 2003, is $450.87, and yields a compensation rate of $300.60.
6. The parties stipulated the following documentary evidence at the hearing before the Deputy Commissioner:
 a. Stipulated Exhibit #1: Medical records
 b. Stipulated Exhibit #2: I.C. Forms
7. In addition to Stipulated Exhibits, the following exhibits were admitted into evidence at the Deputy Commissioner's hearing:
 a. Plaintiff's Exhibit #1: Out of work notes
 b. Plaintiff's Exhibit #2: Correspondence
8. The issue before the Full Commission is whether plaintiff is entitled to additional benefits arising from his August 3, 2006 fall.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 39 years old. On October 16, 2003, plaintiff was employed by defendant as a behavioral management technician.
2. On October 16, 2003, plaintiff suffered an injury by accident to his left knee that was accepted as compensable by defendant. After the injury, plaintiff ceased his employment with defendant and began receiving temporary total disability payments on November 10, 2003.
3. Prior to his compensable injury by accident to the left knee, plaintiff underwent two arthroscopic procedures on that same knee. One procedure was for a partially torn anterior *Page 4 
cruciate ligament. The second procedure was for chondromalacia of the medial femoral condyle and debridiment of the meniscus. As a result of the October 16, 2003 compensable injury, plaintiff underwent four additional surgeries performed by Dr. Adam Flowers, including a November 10, 2003 arthroscopic lateral release with chondroplasty of the medial femoral condyle to decrease mechanical problems due to cartilage abnormalities behind the knee; a January 7, 2004 ACL reconstruction with hamstring autograft due to knee instability; an April 29, 2004 Maquet osteotomy (tibial tubercle elevation procedure) due to cartilage problems on back of kneecap; and an October 18, 2004 debridement of the patellofemoral joint (lateral release and patella realignment procedure) due to scar tissue and to remove cartilage.
4. On November 22, 2004, plaintiff began employment with the City of Locust in the sewer management department.
5. On January 10, 2005, plaintiff returned to Dr. Flowers with complaints of tightness in the left knee, with some mechanical popping. At that time, plaintiff was released to return to work without restrictions.
6. On June 16, 2005, Dr. Flowers gave plaintiff a ten percent permanent partial impairment rating to the left leg.
7. On July 29, 2005, plaintiff began working for the Stanly County Sheriff's Office as a detention officer.
8. On October 26, 2005, plaintiff saw Dr. Neal Taub for a second opinion. Dr. Taub noted complaints of continued lower extremity weakness, numbness, and tingling around the knee, and assigned plaintiff a 20% permanent partial impairment rating to the left leg.
9. In June 2006, plaintiff began working for Guard-One Protective Services as a security guard. Plaintiff's job duties with Guard-One required that he qualify on a shooting *Page 5 
range, be able to conduct foot patrol and vehicle patrol, and have no physical limitations. The job also required the ability to walk or stand for 12 hours and the ability to chase and restrain suspected trespassers when necessary.
10. Beginning in April 2006, plaintiff's knee began locking up and giving out while he was walking. On April 7, 2006, plaintiff submitted a Form 33 requesting further medical treatment for his left knee/leg.
11. On August 3, 2006, plaintiff was walking down the stairs of his deck at home when his knee came out from under him and he fell down the stairs, landing on his left knee on his gravel driveway. Plaintiff testified that his knee "gave way" but did not lock up. Plaintiff sought treatment at Northeast Medical Center that day for the injury. His family physician, Dr. Cheryl Sexton, wrote him out of work from August 3, 2006 until August 24, 2006, when plaintiff saw Dr. Flowers.
12. On August 24, 2006, Dr. Flowers noted plaintiff had a return of pre-surgery symptoms of pain for approximately one month's duration. Dr. Flowers did not note a history of a recent fall. Dr. Flowers ordered an MRI and provided plaintiff with work restrictions, including the use of crutches, no squatting or kneeling and alternate sitting and standing.
13. Plaintiff returned to Dr. Flowers on September 7, 2006. The MRI showed a focal nodular mass on the anterior articular surface of the medial femoral condyle (the inner part of the left knee). The MRI reader diagnosed plaintiff with possible villonodular synovitis or chondromatosis. Based upon the problems that could develop should the lesion be chondromatosis, Dr. Flowers referred plaintiff to tumor specialist Dr. Jeffrey Kneisl for further examination and added to plaintiff's work restrictions that he was limited to a sitting job.
14. Plaintiff presented to Dr. Kneisl on September 21, 2006. Dr. Kneisl examined *Page 6 
plaintiff and reviewed both plaintiff's new and old MRIs and the notes from Dr. Flowers. Dr. Kneisl also diagnosed plaintiff with chondromalacia. He opined that the growth was likely the result of a piece of cartilage left in the knee post-surgery that had implanted into the inner knee lining and began to slowly grow. He further opined that the cartilage mass was unlikely to be the cause of plaintiff's knee pain and would not cause mechanical problems in its current size. Dr. Kneisl did not offer an opinion as to what might be the cause of plaintiff's knee pain. Dr. Kneisl did not recommend surgical removal of the mass until it reached the approximate size of a quarter, which would take 15 to 20 years, if ever, further noting that this type of mass often stops growing on its own.
15. Plaintiff returned to Dr. Flowers on October 6, 2006 to discuss the findings of Dr. Kneisl. Because Dr. Flowers still lacked objective findings for plaintiff's knee pain, he opined that plaintiff required further examination. Dr. Flowers testified that more than likely, plaintiff's current problems were related to his original 2003 claim. However, regarding plaintiff's symptoms of the knee giving out, Dr. Flowers was unable to point to a specific causation, noting that it could be the result of his prior surgeries, his current employment's physical demands or a number of other factors. He further noted that even with plaintiff's history of knee surgeries, he was no more likely than persons without such a history to develop knee buckling or giving-way symptoms. Dr. Flowers continued plaintiff's light-duty restrictions through November 6, 2006.
16. On November 6, 2006, plaintiff presented to Dr. William Mason, an orthopedist, for a one-time evaluation. Dr. Mason examined plaintiff, received an oral history and reviewed the MRI taken in 2006; however, he did not review the records from Dr. Flowers or Dr. Kneisl. Dr. Mason diagnosed plaintiff with chondromalacia. Dr. Mason testified,
 I think that with somebody that's had four surgeries, there's a lot of scar tissue from all the surgeries that he had done, which is an *Page 7 
extensive amount of surgery. I think you've got to expect that this man, obviously, is not going to have a normal knee. And I think it's probably been weakened by the surgeries. And the fact that the knee actually gave way, means that it may very well have a relationship to the original injury, either from scarring under the kneecap, again surgery; weakness in the ligaments; obviously, he's had a replacement. . . . And that fact that he still has fluid in his knee, indicates to me that this is still a relationship to the original injury.
Dr. Mason testified that plaintiff's pain and swelling are most likely related to scar tissue that formed within plaintiff's knee joint as a result of his original injury in 2003 and the resulting surgeries. Dr. Mason stated that plaintiff's cartilage mass was the cause of both his pain and swelling, based upon the possibility that a piece of cartilage had broken off, grown to a greater size, worked its way between the bones of the knee, and thereafter caught on the piece of cartilage, causing pain and the knee joint to catch. Dr. Mason recommended exploratory arthroscopic surgery.
17. The Commission gives greater weight to the opinions of Dr. Flowers and Dr. Mason than to Dr. Kneisel and finds that plaintiff's fall on August 3, 2006 was a natural and direct result of his October 16, 2003 injury by accident and resulting medical treatment.
18. Major William Keiser, operations manager for Guard-One, and Lisa Holloway, health and safety administrator for Guard-One, both testified that Guard-One did not have work available for plaintiff within his restrictions. Thus, although plaintiff was on light-duty work restrictions after August 24, 2006, he did not return to work for Guard-One until August 6, 2007 when some light-duty employment became available.
19. Defendant has not defended this action without reasonable grounds.
 *********** *Page 8 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 16, 2003, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. In a claim for additional compensation for medical treatment, the treatment must be "directly related to the original compensable injury."Pittman v. Thomas Howard, 122 N.C. App. 124, 130, 468 S.E.2d 283,286, disc. review denied, 343 N.C. 513, 471 S.E.2d 18 (1996). It is the burden of the injured worker to prove that the injury or condition being treated is causally related to the compensable injury by accident. Sneadv. Mills, Inc., 8 N.C. App. 447, 174 S.E.2d 699 (1970). The North Carolina Court of Appeals stated in Parsons v. Pantry, Inc.,126 N.C. App. 540, 485 S.E.2d 867 (1997) that once the Commission has found a claim compensable, a rebuttable presumption arises that the treatment is directly related to the original compensable injury. The burden then shifts to defendant to prove that the medical treatment is not directly related to the compensable injury. Id. In Reinninger v.Prestige Fabricators, Inc., 136 N.C. App. 225, 523 S.E.2d 720 (1999), the Court of Appeals applied the Parsons presumption to a case in which the parties entered into a Form 21 Agreement for Compensation which was approved by the Commission and therefore constituted an "award" of the Commission, pursuant to N.C. Gen. Stat. § 97-82. The Court of Appeals has also held that an employer's payment of compensation pursuant to a Form 60, as in the case before us, is an award of the Commission and that theParsons presumption applies. Perez v. American Airlines,174 N.C. App. 128, 620 S.E.2d 288 (2005), disc. review improvidentlyallowed, ___ N.C. ___, 634 S.E.2d 887 (2006). *Page 9 
3. In the case at bar, plaintiff's August 3, 2006 fall was the direct and natural consequence of the residual knee weakness and instability resulting from his October 16, 2003 injury by accident. As such, theParsons presumption applies and defendant failed to rebut the presumption that the medical treatment is directly related to the compensable injury. Parsons v. Pantry, Inc., supra.; Starr v. Charlotte Paper Co.,Inc., 8 N.C. App 604, 175 S.E.2d 342 (1970). Thus, plaintiff is entitled to temporary total disability benefits beginning August 3, 2006 and continuing until August 6, 2007. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
5. The defense of this claim was reasonable and not stubborn, unfounded litigiousness and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1; Sparks v. Mountain BreezeRestaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney fee awarded below, defendant shall pay plaintiff temporary total disability compensation at the rate of $300.60 per week beginning August 3, 2006 and continuing until August 6, 2007. This amount has accrued and shall be paid in a lump sum.
2. Defendant shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and *Page 10 
treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
3. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
4. Plaintiff's request for attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1 must be and is hereby denied.
5. Defendant shall pay the costs.
This 31 day of October, 2007.
S/_____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/________________________ PAMELA T. YOUNG CHAIR
 S/________________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1